**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **VINCENT D. DIFELICE, on behalf of** | ) |
| **himself and all others similarly situated,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )          **Case No. 1:04cv889** |
| | ) |
| **US AIRWAYS, INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**MEMORANDUM OPINION**

At issue at the threshold dismissal stage in this breach-of-fiduciary-duty action

brought pursuant to § 502(a)(2) of the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1132(a)(2), is the nature of a directed trustee's duties to the

participants in a 401(k) retirement plan.  More specifically, the question presented is whether

a directed trustee under ERISA § 403(a) has a duty to challenge the continued inclusion of

company stock as one of several investment choices in the company's 401(k) plan where, as

here, publicly available information indicated that the company was considering filing for

bankruptcy protection, but had not yet done so.

**I.**[1]

Defendant US Airways, Inc. ("US Airways") is a Delaware corporation and a major

American passenger airline.  In 1988, US Airways[2] created the US Airways, Inc. 401(k)

---

[1] Because the matter is before the Court on a motion to dismiss for failure to state a
claim on which relief can be granted, the facts recited here are derived from plaintiff's
Amended Complaint.  *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994)
(plaintiff's version of facts accepted as true at FED. R. CIV. P. 12(b)(6) stage).

[2] At the time, US Airways was known as US Air, Inc.

Savings Plan ("the Plan"), an ERISA retirement plan, for the express purpose of providing

retirement income for certain of its employees.  The Plan[3] permits participating employees to

make tax-deferred payroll contributions to individual retirement savings accounts, and to

direct the investment of their contributions among several different investment options.  In

addition, the Plan requires US Airways to make matching cash contributions to eligible

participants' accounts. Plan §§ 4.8-4.10.  The Plan makes participants "solely responsible" for

investment decisions, and states that no "other person or entity shall be liable for any loss or

liability that results from [a] Participant's or Beneficiary's exercise of control" over his Plan

account.  Plan § 6.4; *see also* Plan § 16.5 (disclaiming guarantee from Plan losses).  Under

the Plan's terms, US Airways is designated as the Plan administrator and fiduciary, and is

expressly given responsibility for selecting and, if necessary, terminating the investment

options available to Plan participants.  Plan §§ 13.1, 7.1, 7.2; Pl.'s Am. Compl. ¶¶ 7, 25, 29.

The Plan also directs US Airways to enter into a trust agreement for the holding, management

and administration of all Plan assets, and provides that the terms of the trust agreement are to

be incorporated by reference into the Plan itself.  Plan § 14.1.

Pursuant to this direction, US Airways, in 1993, entered into a trust agreement for the

Plan ("the Trust Agreement") with defendant Fidelity Management Trust Company

("Fidelity"), by which agreement Fidelity became the Plan trustee.  The Trust Agreement[4]

---

[3] Because plaintiff's Amended Complaint refers extensively to the Plan, it is appropriate to consider the Plan and its provisions when ruling on the motion to dismiss, and doing so does not convert the motion into one for summary judgment.  *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 623 n.4 (E.D. Va. 2000).

[4] Like the Plan, the Trust Agreement is an integral part of plaintiff's Amended Complaint, and it is thus appropriate to consider the provisions of the Trust Agreement when

confers broad, discretionary powers and duties on Fidelity for the management of Plan assets,

but makes those powers subject to the directions of US Airways and the Plan participants.

Trust Agreement §§ 1.1-1.5.  Specifically, the Trust Agreement states that US Airways "shall

direct the Trustee . . . [to] invest the assets of the Trust in separate Investment Funds," and

that apart from providing US Airways with a list of investment options, "[t]he Trustee shall

have no responsibility for the determination of Investment Funds . . . and shall not render

investment advice to any person in connection thereto."  Trust Agreement § 1.5(a).  The same

section of the Trust Agreement further states that "[t]he Trustee shall be required to follow

the directions . . . given to it [by US Airways], except that the Trustee shall not be required to

follow any directions that would result in a breach of the Trustee's fiduciary duties."  *Id.*  The

Trust Agreement also provides that:

> [T]he Trustee shall not be liable for any loss, or by reason of any breach,
> arising from the direction [of US Airways] unless it is clear on the direction's
> face that the actions to be taken under the direction would be prohibited by
> [ERISA's] fiduciary duty rules . . . or would be contrary to the terms of the
> Plan or [the Trust] Agreement.

Trust Agreement § 1.13.

The Trust Agreement also requires the trustee to act at the direction of individual Plan

participants:

> [E]ach Participant shall direct the Trustee with respect to investment of the
> funds reflected in his Separate Account among the Investment Funds . . . . The
> Trustee shall not render investment advice to any Participant and shall be
> under no duty to question any such direction of a Participant with respect to
> investments.

Trust Agreement § 1.5(b).  As a corresponding limitation on Fidelity's liability, the Trust

---

ruling on the present motion to dismiss.  *See supra* note 3.

Agreement provides that when directed in such a manner, the Trustee shall not be liable "for any losses which may result from either the Participant's direction of any investment made pursuant to this paragraph or for any loss which may result by reason of failure of a Participant to make such direction." *Id.*

Among the range of investments that US Airways selected as Plan investment options was the US Air Group Common Stock Fund ("the Company Stock Fund"), which was to consist exclusively of shares of US Air Group, Inc. ("US Air Group"),[5] the parent company of US Airways, and cash. This choice was expressly contemplated by Article VIII of the Trust Agreement, entitled "Investments in Company Stock," which sets forth specific provisions governing the Company Stock Fund's composition and management. Article VIII provided that the Company Stock Fund would include, in addition to US Air Group common stock, enough cash "to satisfy the Fund's cash needs for transfers and payments," and tasked US Airways and Fidelity jointly with determining a "cash target range" that would be sufficient in this respect. Trust Agreement § 8.1. Article VIII further provided that Plan assets "may be invested in Company Stock to the extent necessary to comply with investment directions provided by the Plan Participants or the Company [*i.e.*, US Airways]." Trust Agreement § 8.2. Consistent with this provision, Article VIII also stated that US Airways would be responsible for "continually monitor[ing] the suitability under the fiduciary duty rules of Section 404(a)(1) of ERISA . . . of acquiring and holding Company Stock," and that Fidelity would not be liable for any loss resulting from Plan participants' or US Airways'

---

[5] After the execution of the Trust Agreement, US Airways' parent company changed its name to "US Airways Group, Inc." For purposes of clarity and to avoid confusion with "US Airways," the parent company will be referred to throughout as "US Air Group."

directions with respect to the Company Stock Fund, unless it was "clear on [the] face" of such directions "that the actions to be taken . . . would be prohibited by [ERISA's] fiduciary duty rules or would be contrary to the terms of the Plan or [the Trust] Agreement." Trust Agreement § 8.3.  Although Article VIII was later amended in January 2002, the alterations were few and immaterial.[6]  Neither party contends that the amendments constitute any substantive change to Article VIII or the Trust Agreement.

The Company Stock Fund remained an available investment option for Plan participants from 1993 until 2002, when US Airways filed for bankruptcy.  By then, plaintiff contends, the harbingers of US Airways' financial decline had been apparent for some time. At the end of 1998, Fidelity held in excess of 417,000 shares of US Air Group stock — worth nearly $21.7 million — in various mutual funds it actively managed apart from the Company Stock Fund.  Pl.'s Am. Compl. ¶ 135.  In the first quarter of 1999, Fidelity liquidated about one-half of these shares.  Pl.'s Am. Compl. ¶ 136.  Fidelity sold approximately two-thirds of the remaining shares the following quarter, and by the end of 1999 had reduced its holdings in US Air Group to 57,000 shares, worth approximately $1.8 million.  Pl.'s Am. Compl. ¶¶ 135-36.  At that time or shortly thereafter, US Air Group and US Airways began recording significant operating losses, losses that a US Airways employee bulletin would later describe as the product of "the combined impact of a weak economic environment and expanding

---

[6] *See* Trust Agreement, 12th Am.  Section 8.1 was changed to state that the Company Stock Fund would be invested "primarily" in US Air Group stock, and would maintain enough cash "to satisfy daily Participant exchange or withdrawal requests."  Section 8.3 was changed to state that Fidelity would "not be liable for any loss which arises from the directions of the Company with respect to the acquisition and holding of Company Stock, unless it is clear on their face that the actions to be taken under those directions would be prohibited by [ERISA's] fiduciary duty rules or would be contrary to the terms of this Agreement or the Plan as communicated in writing by the Company to the Trustee."

competition from low-cost competitors and network carriers."  Pl.'s Am. Compl. ¶ 46.

In May 2000, in an attempt to reverse US Airways' flagging fortunes, US Air Group executed a tentative merger agreement with UAL Corp. ("UAL"), the parent company of United Air Lines, Inc. ("United"), which would have consolidated United and US Airways into a single entity.  Following the announcement of the proposed merger, the share price of US Airways stock nearly doubled, going from approximately $26 to $49 in a single day.  In October 2000, US Airways' shareholders voted on and approved the proposed merger.

At the close of 2000, the US Airways-United merger had not yet been consummated, and US Airways and US Air Group reported pre-tax operating losses for the year of $350 million and $270 million, respectively.  In February 2001, in a U.S. Senate hearing on airline consolidation, Stephen Wolf, the Chairman of US Airways' Board of Directors, explained that bankruptcy and dissolution were "real threats" for US Airways if the merger with United did not come to fruition.  Two months later, US Air Group reported an operating loss of $228 million for the first quarter of 2001.  During a public conference call held in connection with the announcement of this loss, US Airways President and CEO Rakesh Gangwal informed investors that there was no "Plan B" for US Airways if the proposed merger did not receive regulatory approval, meaning presumably that absent a merger with United, US Airways would likely seek bankruptcy protection.  Also, investment analysts at this time were skeptical of US Airways' long-term prospects, noting that the proposed merger faced significant antitrust obstacles.  By the end of May 2001, the price of US Airways stock had fallen to $24.18 per share, less than one-half of the proposed purchase price of $60 per share, and, indeed, less even than its pre-merger-announcement price of $25.94.  Additionally, Moody's Investors Service ("Moody's") lowered its rating of US Airways' senior secured

debt from Ba3 to B1, indicating that such debt was considered speculative.

In late July 2001, the U.S. Department of Justice announced that it intended to file suit to block the pending US Airways-United merger.  As a result, US Air Group and UAL terminated their merger agreement.  Subsequently, the *Wall Street Journal* noted that the merger's failure "le[ft] the two airlines to grapple with fundamental problems they had hoped the big merger would fix . . . . US Airways, plagued by high costs and a stunted route network, has lost money in the past four quarters and is expected to stay in the red this year and the next."  Pl.'s Am. Compl. ¶ 58.  About the same time, Standard & Poor's changed its outlook for US Airways to "negative."  On July 31, 2001, the price of US Air Group shares closed at $17, down from a high of $49 following the announcement of the proposed merger in May 2000.

Approximately six weeks after the termination of the merger agreement, US Airways' problems were compounded by the terrorist attacks of September 11, 2001, and the ensuing declines in tourism and air travel.  At a shareholders meeting held eight days after the attacks, Chairman Wolf candidly admitted that US Airways "ha[d] never seen such a cataclysmic falloff in revenue," and that operating costs would have to be reduced "dramatically" if US Airways were to survive as a going concern.  Pl.'s Am. Compl. ¶ 65.  Two days later, a *Wall Street Journal* article identified US Airways as one of the two or three airlines most likely to seek bankruptcy protection in the near future.  Pl.'s Am. Compl. ¶ 68.  Contemporaneously, Moody's lowered its debt ratings for US Airways' senior secured debt from B1 to B2 and Standard & Poor's again lowered its ratings for US Airways' senior secured debt from "B" to "CCC+".  By the end of September 2001, the price of US Air Group stock had fallen to $4.10 per share.  US Air Group and US Airways ultimately recorded net losses for 2001 of $2.12

billion and $1.86 billion, respectively.

US Airways' and US Air Group's financial situations did not improve in 2002.  In an annual report filed in March 2002, US Air Group acknowledged that it expected to lose $3 million per day throughout the first quarter of the year.  Two months later, in its 2002 first-quarter filings with the SEC, US Airways stated that it was contemplating filing for bankruptcy if it were unable to obtain employee concessions and government loans.  By then, US Airways had already engaged the services of bankruptcy counsel.  At the end of June 2002, US Airways announced that it would defer payment on certain of its debt obligations. Approximately six weeks later, on August 11, 2002, US Air Group and seven of its subsidiaries and affiliates, including US Airways, filed for Chapter 11 bankruptcy protection. The New York Stock Exchange thereupon suspended trading in US Air Group stock, which had become virtually worthless.  Shareholder interests in US Air Group stock were later "wiped out" in the company's reorganization plan.  Pl.'s Am. Compl. ¶ 86.

As previously noted, the Company Stock Fund remained an investment option available to Plan participants throughout the period of US Airways' descent into bankruptcy. During most of the pre-bankruptcy period, in fact, the Company Stock Fund regularly increased its holdings in US Air Group stock.  Until June 2002, Fidelity and US Airways maintained a "cash target" for the Fund of 10%, meaning that at any given time, roughly 90% of the Company Stock Fund's holdings would consist of US Air Group shares.  Pl.'s Am. Compl. ¶ 91.  Accordingly, as Plan participants made additional contributions to the Company Stock Fund, and as US Air Group's stock price fell, Fidelity would purchase shares of US Air Group stock for the Company Stock Fund to maintain its 9-to-1 stock-to-cash ratio. From July 2001 until May 2002, Fidelity's purchases occurred with such frequency that the

Company Stock Fund's US Air Group holdings more than doubled, rising from 10.6 million shares, or 15.8% of all shares outstanding, to 22 million shares, or 32.6% of all shares outstanding.  Pl.'s Am. Compl. ¶ 88.  Additionally, between April 1, 2002 to June 30, 2002, as some of these purchases were being made, Fidelity liquidated the last 50,000 shares of US Air Group stock remaining in its actively managed mutual funds.  Pl.'s Am. Compl. ¶ 135.

In late June 2002, US Airways appointed Aon Fiduciary Counselors, Inc. ("Aon") as an independent fiduciary for the Plan to make all investment decisions concerning the Company Stock Fund.  Pl.'s Am. Compl. ¶ 98; *see also* Trust Agreement, 13th Am.  Upon appointment, Aon ceased further purchases of US Air Group stock, and began to liquidate the shares then held to the extent possible without adversely affecting the stock's market value.  When US Airways filed for bankruptcy six weeks later, Aon had been able to sell only 10% of the Company Stock Fund's US Air Group holdings, leaving the Company Stock Fund with 19.8 million shares and $16.8 million in cash.  Pl.'s Am. Compl. ¶¶ 103.

In July 2004, Plaintiff, Vincent D. DiFelice, a US Airways employee and Plan participant, brought this class action lawsuit against US Airways and Fidelity pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), seeking to recover losses to the Plan resulting from the diminution in value of US Air Group stock between August 1, 2001 and August 11, 2002, the date of the bankruptcy filing.  Plaintiff alleges that by August 1, 2001 — shortly after the Justice Department announced that it would file suit to block the US Airways-United merger — defendants knew or should have known that US Air Group stock was no longer a prudent investment, and thus breached their duties as Plan fiduciaries under ERISA §§ 404(a)(1), 29 U.S.C. § 1104(a)(1), and 403(a), 29 U.S.C. § 1103(a), by continuing to offer the Company Stock Fund as a Plan option, and continuing to invest Plan assets in US Air

Group stock, after that date.[7]  Plaintiff asserts (i) one count of breach of fiduciary duty against

US Airways; (ii) one count of breach of fiduciary duty against Fidelity; and (iii) one count of

liability as a co-fiduciary pursuant to ERISA § 405(a), 29 U.S.C. § 1105(a), against both

defendants.  Fidelity subsequently moved to dismiss the claims against it pursuant to Rule

12(b)(6), Fed. R. Civ. P., contending that the Plan and the Trust Agreement establish that it is

a "directed trustee" under ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1), and that as such, the

claims against it are insufficient as a matter of law.  The motion has been fully briefed and

argued, and is now ripe for disposition.

## II.

A motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., tests the legal

sufficiency of a plaintiff's claims, and should not be granted unless it appears that the plaintiff

can prove no set of facts that would entitle him to relief.  *See Randall v. United States*, 30

F.3d 518, 522 (4th Cir. 1994); *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.

1993).  When reviewing a claim under Rule 12(b)(6), a court must accept as true all well-

pleaded factual allegations and construe such allegations in the light most favorable to the

plaintiff.  *See Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991).  Because the purpose

of a Rule 12(b)(6) motion is to test the legal sufficiency of a plaintiff's claims, however, a

court need not accept the legal conclusions a plaintiff draws from his factual allegations.  *See*

*id.*

## III.

---

[7] Accordingly, Plaintiff describes as the putative class of plaintiffs all Plan participants
and beneficiaries thereof who held positions in the Company Stock Fund between August 1,
2001, and August 11, 2002.

Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), permits a participant in an ERISA retirement plan to bring a civil action against a plan fiduciary for relief under ERISA § 409(a), 29 U.S.C. § 1109(a), which obligates the fiduciary "[to] make good to such plan any losses to the plan resulting from [any] breach" of its fiduciary duties.  The general duties of a fiduciary are outlined in ERISA § 404(a)(1), and include selecting and monitoring plan investments "with the care, skill, prudence and diligence ... that a prudent man acting in like capacity and familiar with such matters would use."  29 U.S.C. § 1104(a)(1)(B).  A person cannot be liable under ERISA § 409(a), however, unless that person is a fiduciary as defined by ERISA.

**1. Fidelity's Status as a Fiduciary and Directed Trustee**

The parties correctly agree that Fidelity is a fiduciary under ERISA.  Yet, this agreement does not resolve the matter, for not all ERISA fiduciaries are the same.  Specifically, ERISA defines fiduciary status in functional terms, whereby a person is considered a plan fiduciary under ERISA only "*to the extent* he exercises any discretionary authority or discretionary control respecting management of [the] plan or exercises any authority or control respecting management or disposition of its assets. . . ."[8] ERISA

---

[8] The fact that Article 13.1 of the Plan provides that "[t]he Company and the Trustee shall be a 'named fiduciary' as that term is defined in Section 402(a)(2) of the Act" does not alter the functional nature of the analysis of fiduciary status.  ERISA § 405(c) provides that the "instrument under which a plan is maintained may expressly provide for procedures . . . for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries . . . ."  Pursuant to this subsection, Article 13.1 of the Plan sets forth procedures by which US Airways could allocate any of its authority to Fidelity.  Significantly, however, these procedures provide that "no allocation or delegation by the Company of any of its powers, authority or responsibilities to the Trustee shall become effective unless such allocation or delegation shall first be accepted by the Trustee in a writing signed by it and delivered to the Company."  The record reflects that no such allocation or delegation to Fidelity ever occurred and hence US Airways retained all of its fiduciary responsibilities as a

§ 3(21)(A), 29 U.S.C. § 1002(21)(A)(emphasis added).  According to the Fourth Circuit, the statutory phrase "to the extent" indicates that "a party is a fiduciary [under ERISA] only as to the activities which bring the person within the definition."  *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992).  It is therefore necessary to determine whether Fidelity "is a fiduciary with respect to the particular activity at issue."[9]  *Id.*

While Fidelity clearly had authority over certain activities assigned to it as a trustee under the Plan, and would therefore be subject to § 404(a)'s duty of ordinary prudence in carrying out those activities, none of those activities is at issue here.[10]  Instead, the "particular activity at issue" here concerns the retention of the Company Stock Fund as an investment option for Plan participants.  Fidelity's liability in this case, hinges, therefore, on the extent of its authority and control over the decision to retain or exclude the Company Stock Fund as a Plan investment option.[11]

---

named fiduciary.

[9]  This functional approach to fiduciary duty is also supported by the language of ERISA § 404(a) which holds fiduciaries to the care of a prudent man only when engaged "in the conduct of an enterprise of a like character and with like aims."  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

[10]  The Plan § 14.1 provides that "[t]he Company shall enter into a Trust Agreement with a Trustee, setting forth the terms, provisions, and conditions pursuant to which the Trustee shall hold, manage, and administer all assets of the Plan in the Trust."  The Trust Agreement, in turn, sets forth a host of duties over which Fidelity exercises "authority or control," and is therefore a fiduciary.  For example, the Trust Agreement provides that Fidelity may "deposit funds, pending investment or distribution thereof, in any bank . . . ." Trust Agreement § 1.8, and that Fidelity may "pay out of the Trust . . . any and all taxes . . . ." *Id.* at § 1.9.  When carrying out these duties Fidelity was bound by the ordinary care standard of ERISA § 404(a), but plaintiff does not allege a breach by Fidelity with respect to any of these assigned duties.

[11]  *See, e.g.*, *Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998) ("Because one's fiduciary responsibility under ERISA is directly and solely attributable to his possession or exercise of discretionary authority, fiduciary liability arises in specific

As to this particular activity, Fidelity correctly claims to be a "directed trustee," subject to the proper directions of a named fiduciary, and therefore free from liability for acting pursuant to proper directions which are in accordance with the Plan and not contrary to ERISA. Although not found in § 403(a) or elsewhere in the statute, the term "directed trustee" is widely used in common parlance to describe a plan trustee where, as § 403(a) notes and as is true here, "the plan expressly provides that the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee." ERISA § 403(a), 29 U.S.C. § 1103(a). It follows, therefore, that Fidelity's status as a trustee, directed or otherwise, must be determined by reference to the Plan and the Trust Agreement, which the Plan expressly incorporates. Plan § 14.1. *See Beddall,* 137 F.3d at 19-21 ("The starting point for reasoned analysis of the Bank's fiduciary status is the Agreement."); *see also, Coleman*, 969 F.2d at 61 ("The discretionary authority or responsibility which is pivotal to the statutory definition of 'fiduciary' is allocated by the plan documents themselves.").

Read together, the Plan and the Trust Agreement make clear that Fidelity is a directed trustee with respect to decisions to include a given investment option in the Plan. Thus, Article 13.1 of the Plan provides that US Airways is a "named fiduciary," and that only US Airways has the authority to select the various investment options from which the participants may choose. And significantly, the Plan also provides that US Airways may not allocate or delegate any of its powers to the trustee without the trustee's written consent, which did not occur here. Plan § 13.1; *see supra* note 8. While Articles 1.1-1.4 of the Trust Agreement grant Fidelity certain powers to effectuate investment decisions, these powers are expressly

increments correlated to the vesting or performance of particular fiduciary functions in service of the plan, not in broad general terms.").

made subject to paragraphs (a) and (b) of Article 1.5, which provide that Fidelity exercise these powers only at the direction of US Airways or the Plan participants.  Trust Agreement §§ 1.1-1.5.  Specifically, the Trust Agreement provides that US Airways shall direct Fidelity to invest in investment funds of US Airways' choosing and that Fidelity "shall have no responsibility for the determination of Investment Funds and shall not render investment advise [sic] to any person in connection thereto."   Trust Agreement § 1.5(a).  Clearly, therefore, with respect to the selection of Plan investment options, Fidelity is bound by the terms of the Trust Agreement to follow the directions of US Airways and is therefore a "directed trustee" within the meaning of ERISA § 403(a).  Significantly, other courts presented with essentially similar plans and trust agreements have reached the same conclusion.  *See, e.g., Beddall*, 137 F.3d at 19-21 (finding a directed trustee relationship when the plan vested authority in a named fiduciary to direct the trustee); *See In re Worldcom, Inc. ERISA Litig.*, 354 F.Supp. 2d 423, 441-43 (S.D.N.Y. 2005) (same) [hereinafter *Worldcom II*]; *Koch v. Dwyer*, No. 98-5519, 1999 U.S. Dist. LEXIS 11101, at *21-32 (S.D.N.Y. July 22, 1999) (same).

Plaintiff resists this conclusion, arguing that the Trust Agreement, in Article 8.1,[12] grants Fidelity discretion over the mix of cash and stock in the Company Stock Fund, and that this shows that Fidelity is not a directed trustee, but rather a full-fledged fiduciary whose conduct must meet the "prudent man" standard of ERISA § 404(a) with respect to setting the cash target range of the Company Stock Fund.  From this unremarkable proposition, plaintiff

---

[12] Article 8.1 of the Trust Agreement states, in part: "A cash target range shall be determined by the Trustee in conjunction with the Company for the cash portion of the USAir Group Common Stock Fund and shall be set forth in a written communication to the Company."

leaps to the conclusion that Fidelity violated its fiduciary duty by failing to increase the cash target range, as an investment hedge, when it became evident that US Airways might file for bankruptcy protection and that US Air Group stock might lose its value.

This argument fails; it places far more weight on Article 8.1 of the Trust Agreement than the provision can bear, as it is an attempt to infer a broad grant of discretionary investment authority from an explicitly narrow grant of authority for a limited purpose.   In other words, plaintiff's argument is an attempt to use a narrow and limited exception to swallow the general rule, made clear in the Trust Agreement, that Fidelity is a directed trustee with respect to the selection of investment options for Plan participants.

Plaintiff's argument also misunderstands the purpose of the cash component in the Company Stock Fund and the trustee's role in selecting the cash target range.  The cash component of the Company Stock Fund was plainly not intended as an alternative investment or hedge against the performance of the US Air Group stock, but rather as a means "to satisfy the Fund's cash needs for transfers and payments."  Trust Agreement § 8.1.  Similarly, the Trust Agreement's provision that "the cash target range shall be determined by the Trustee in conjunction with the Company" is not, as plaintiff alleges, a grant of discretionary investment authority to Fidelity, but a recognition that Fidelity and US Airways together are in the best position to estimate the amount of cash necessary to fulfill the limited purpose of the Company Stock Fund's cash component.  The Trust Agreement's language stating that "[t]he Trustee is responsible for ensuring that the actual cash held in the Company Stock Fund falls within the agreed upon range over time" further demonstrates the limited nature of Fidelity's authority over the cash component of the Company Stock Fund.  Trust Agreement § 8.1. Contrary to plaintiff's assertions, Fidelity did not have the authority to alter the ratio of cash

to stock in the Company Stock Fund for investment purposes.  Nor does plaintiff allege facts sufficient to demonstrate that Fidelity violated the "prudent man" standard with respect to its duties involving the cash component's actual purpose.[13]

In sum, the Plan and the Trust Agreement, taken together, make clear that Fidelity is, in common parlance, a "directed trustee" subject to the directions of US Airways in regards to the selection of investment options for the Plan.  This conclusion does not, of course, end the analysis; instead, it begs the further question presented by Fidelity's dismissal motion, namely whether Fidelity, as a directed trustee, had a duty to challenge or remove US Airways stock as one of the Plan investment choices for participants in light of the publicly available information concerning US Airways' dim financial prospects.  If Fidelity had no such duty to act, it cannot be held liable for failing to act in this regard.

## 2. Fidelity's Duties as a Directed Trustee

Fidelity's duties as a directed trustee are prescribed by ERISA § 403(a), which provides that where a trustee is "subject to the direction of a named fiduciary," as Fidelity is here subject to the direction of US Airways, then Fidelity must comply with the "proper directions" of such trustee which are made in accordance with the plan and are not contrary to ERISA.[14]  ERISA § 403(a), 29 U.S.C. § 1103(a).  And because Fidelity must comply with all

---

[13] The complaint does not allege that the amount of cash in the Company Stock Fund was ever insufficient to fulfill the cash component's limited, non-investment purposes.  On the contrary, the complaint makes clear that the amount of cash in the Fund frequently exceeded the agreed upon range and that Fidelity used this excess cash to acquire more US Air Group stock for the fund.

[14] ERISA § 403(a) states, in pertinent part, that the trustee of an ERISA governed benefit plan:
   shall have the exclusive authority and discretion to manage and control the
   assets of the plan, *except to the extent that* . . . the plan expressly provides that

US Airways' directions that are proper and not contrary to the Plan or ERISA, it follows that Fidelity's liability is limited to instances in which it fails to follow such proper directions or it complies with directions that are improper, or contrary to the Plan or ERISA.  Just as there can be no liability for breach of a duty where no duty exists, neither can Fidelity incur liability for following US Airways' directions that are proper and consistent with the Plan and ERISA.[15]  Indeed, Fidelity had no discretion to do otherwise.  More particularly, the application of § 403(a) in this case means that if US Airways' continuing direction to retain

---

the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee, in which case the trustees shall be subject to proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to this chapter . . . .

ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1) (emphasis added).  *See Worldcom II*, 354 F. Supp. 2d at 444 ("Since a person is a fiduciary to a plan "only 'to the extent' the person functions as a fiduciary, . . . the fiduciary obligations of directed trustees are circumscribed by the parameters of their duties pursuant to Section 403(a).").

[15] Some courts have held that a directed trustee's lack of discretionary authority strips it of any fiduciary status.  *See Wright v. Oregon*, 360 F. 3d 1090, 1103 (9th Cir. 2004) ("ERISA relieves a trustee from fiduciary obligations regarding the management and control of a plan's assets when the trustee is "directed" by the plan's designated fiduciary.").  The weight of authority, however, has relied on the conspicuous absence of the word "discretionary" in the second clause of ERISA § 3(21)(A) to preserve a directed trustee's fiduciary status.  ERISA § 3(21)(A), 29 U.S.C. § 1102(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent . . . he exercises any *discretionary*  authority or *discretionary* control respecting management of such plan *or* exercises any authority or control respecting management or disposition of its assets.") (emphasis added).  *See FirsTier Bank v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994) ("Note that this section imposes fiduciary duties only if one exercises discretionary authority or control over plan management, but imposes those duties whenever one deals with plan assets.  This distinction is not accidental. . . ."); *In re Worldcom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 762 (S.D.N.Y. 2003) [hereinafter *Worldcom I*] ("Section 403(a) does not, therefore, eliminate the fiduciary status or duties than imposed on a trustee with responsibility over ERISA assets.").  *See also,* Department of Labor, Field Assistance Bulletin No. 2004-03 at 2 (Dec. 17 2004) ("While section 403(a)(1) does not remove a directed trustee from section 3(21)'s purview, it significantly limits such a trustee's responsibilities as a plan fiduciary.").  Therefore, while Fidelity is still a fiduciary by virtue of its authority, such authority is greatly constricted by ERISA § 403(a).

the Company Stock Fund as a Plan investment option,[16] was proper and not contrary to the

Plan or ERISA, then Fidelity was bound to follow that direction and may incur no liability for

having done so.[17]  So, the question then becomes whether the continuing direction to Fidelity

to retain the Company Stock Fund as a Plan investment option was proper and not contrary to

the Plan or ERISA.

The question whether that direction was "proper" and not contrary to ERISA or the

Plan is essentially a question of statutory interpretation requiring a sharp focus on ERISA

§ 403(a)'s plain language, as well as its structure and purpose.  *See Casino Ventures v.*

*Stewart*, 183 F.3d 307, 312 (4th Cir. 1999).  The word "proper" has a variety of accepted

meanings — decorous, right, accurate, belong to, etc. — none of which can plausibly be said

to have been intended by Congress in enacting § 403(a).   *See* The American Heritage

College Dictionary 1096 (3d ed. 1993).  Plainly, Congress did not intend that a named

fiduciary's direction meet standards of decorousness or that it be right or accurate in any

mathematical sense.  Instead, it seems clear that Congress, by requiring directions to be

"proper," intended only to require that a direction from a named fiduciary conform to certain

formalities that identify a direction as valid or genuine.  *See Id.* (defining "proper" as "called

for by rules or conventions").  By requiring directions to be "proper" in this sense, Congress

meant to exclude from § 403(a) any communications from the named fiduciary that did not

---

[16] Because US Airways' initial direction to Fidelity to include the Company Stock Fund as a Plan investment option never changed, even as US Airways' fortunes fell, this initial direction can reasonably be characterized as a continuing direction to retain the Company Stock Fund as a Plan investment option.

[17] To be sure, Fidelity was not only required to follow and execute this direction, it had to do so with "care, skill, prudence and diligence. . . ." ERISA § 404(a), 29 U.S.C. 1104(a).

meet certain formal requirements, including that a direction be clear, unequivocal and in writing and that it issue from a person or entity with authority to do so.  Here, the Plan provides that a direction must be in writing and signed by an officer of US Airways, but it does not address the requirement that a direction must be clear and unequivocal, rather than an ambiguous suggestion or comment as to what might be added or subtracted as a Plan investment option.  Construing "proper" in this way gives the term a role to play in the application of § 403(a) that is independent from the role played by the phrase "in accordance with the terms of the plan" and "not contrary" to ERISA, which are the primary constraints on a directed trustee's conduct.  By so doing, this construction honors the principle of statutory construction that no term should be rendered superfluous,[18] and that "statutory language must be read in context because a phrase gathers meaning from the words around it."  *See DIRECTV Inc. v. Nicholas*, 403 F.3d 223, 225 (4th Cir. 2005) (quoting *Gen. Dynamics Land Sys., Inc. v. Cline,* 540 U.S. 581, 596 (2004))   Given this construction of the term "proper," it follows that the initial US Airways' direction to include the Company Stock Fund as a Plan investment option was "proper," and there is no contention to the contrary.

Still remaining is the question whether this continuing direction was contrary to the Plan or ERISA, or put differently, whether, in the circumstances of US Airways' falling

―――――――――――――

[18] *See Discover Bank v. Vaden*, 396 F.3d 366, 369 (4th Cir. 2005) ("[C]ourts must 'give effect to every provision and word in a statute and avoid any interpretation that may render statutory terms meaningless or superfluous.'") (quoting *United States v. Ryan-Webster*, 353 F.3d 353, 366 (4th Cir.2003)).

fortunes, Fidelity had a duty of prudence, on its own, to countermand US Airways' direction and remove the Company Stock Fund as a Plan investment option, and whether failing to do so violated the Plan and ERISA. The answer to this question lies in whether § 403(a) should be read as imposing on directed trustees an implicit duty of ordinary care and prudence to second guess the wisdom of the named fiduciary's directions as to Plan investment options. Properly read, § 403(a) includes no such implicit duty of prudence. To conclude otherwise would effectively eviscerate § 403(a) by eliminating any distinction between the duty of a directed trustee under § 403(a) and the duty of the ERISA named fiduciary with investment authority, who has the duty of ordinary care and prudence prescribed by § 404(a). By including § 403(a) in ERISA, Congress plainly meant to create a subset of ERISA fiduciaries with a statutorily defined duty different from and more narrowly circumscribed than the general duty of ordinary care imposed on other ERISA fiduciaries by § 404(a). If § 403(a) were read to impose a duty of ordinary care on directed trustees to consider the financial merits of a named fiduciary's directions concerning plan investment options and follow only prudent directions, it takes little imagination to see the disputes and litigation such an arrangement would spawn. Congress plainly did not intend such a result. Instead, as the plain language of § 403(a) makes clear, and as is confirmed in the legislative history,[19]

---

[19] The House Conference Report speaks directly to the present controversy:

> [T]he trustee who is directed by [the named fiduciary] is to follow that [named fiduciary's] directions *unless it is clear on their face* that the actions to be taken under those directions would be prohibited by the fiduciary responsibility rules of the bill or would be contrary to the terms of the plan or trust.

H.R. Conf. Rep. No. 93-1280 (1973), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5079 (emphasis added). Thus, according to the legislative history, a directed trustee's duty of inquiry would be limited to the directions themselves, and would not encompass independent judgments

Congress intended that directed trustees defer to the investment judgments of the named fiduciary and not second guess the wisdom of these judgments.

This conclusion does not eliminate the significance of the § 403(a) requirement that a named fiduciary's direction must not violate the plan or ERISA.  In other words, the omission of a duty of ordinary care in § 403(a) does not mean that a named fiduciary's direction, prudent or imprudent, may not violate ERISA or the Plan.  For example, Schedule C of the Trust Agreement enumerates the investment options US Airways is authorized to select for the Plan, and explicitly included investments in US Air Group stock.  US Airways' direction to include an investment option not listed in Schedule C would be patently contrary to the Plan, thus Fidelity, as a directed trustee, could not follow this direction without exposing itself to liability for doing so.  Likewise, a trustee is liable for following directions prohibited by ERISA § 406, 29 U.S.C. § 1106, forbidding fiduciaries from causing the plan to engage in transactions that involve certain conflicts of interest.  And, of course, a directed trustee would also incur liability for following a named fiduciary's direction that was itself a product of fraudulent or illegal collusive action between the directed trustee and the named fiduciary.  Thus, § 403(a), by its plain terms, and properly construed as a part of the overall ERISA scheme, means that a directed trustee has no duty of ordinary care to second guess the investment options chosen by the named fiduciary and because the directed trustee must follow the named fiduciary's proper directions in that regard as long as the direction does not patently violate the plan or ERISA, there can be no liability for doing so.  As there is no

_____

about the prudence of investment decisions.  *See In re Enron Corp. Securities, Derivative & ERISA Litig*, 284 F. Supp. 2d 511, 585-86 (S.D.Tex. 2003) (understanding the legislative history to mean that a directed trustee is not "required to exercise independent judgment" when following directions).

contention that US Airways' directions were patently contrary to the Plan or ERISA, or that Fidelity and US Airways were involved in fraudulent behavior, Fidelity cannot be liable under § 403(a).

Plaintiff's reading of § 403(a) is markedly different.  Plaintiff's argument, distilled to its essence, is that a direction to retain th Company Stock Fund as a Plan investment option in the circumstances at bar would not be a "proper" and that Fidelity acted imprudently in violation of § 404(a) in failing to take timely steps to remove this investment option.  For the reasons already stated, this argument fails.  It incorrectly equates "proper" with "prudent" & impermissibly imports into § 403(a), the § 404(a) duty of ordinary care.  To accept plaintiff's argument, as noted, eviscerates the plain language of § 403(a) which makes a directed trustee "subject to"[20] the "directions"[21] of the named fiduciary.  *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 657 (4th Cir. 1996), while not squarely on point, is nonetheless instructive, as there the Fourth Circuit rejected "an attempt to use the general fiduciary duty standard of § 404(a)(1)(A) to expand the duties imposed under another ERISA section that specifically governed the situation at issue."  *Id.*   Also, as noted, plaintiff's view of § 403(a) runs counter to the overall ERISA scheme, which clearly envisions a special role for directed trustees different from that of ordinary fiduciaries.  Nor is this the only instance in the ERISA scheme where those who are directed are exempted from meeting a higher standard of care.  While ERISA creates a demanding standard of fiduciary responsibility in § 404(a), § 404(c)(1)

---

[20] *See* The American Heritage College Dictionary 1352 (3d ed. 1993) (defining "subject" as "[b]eing under the power or authority of another or others.").

[21] *See Id.* at 392 (defining "direction" as "an authoritative indication; an order or command.").

provides an exception from fiduciary responsibility when fiduciaries act at the direction of

plan participants.[22]  ERISA § 404(c)(1), 29 U.S.C. § 1104(c)(1).  Likewise, ERISA § 405(d)

relieves trustees from fiduciary responsibility when following the directions of an investment

manager: "If an investment manager or managers have been appointed under section

1102(c)(3) of this title, then . . . no trustee shall be liable for the acts or omissions of such

investment manager or managers."  ERISA § 405(d)(1), 29 U.S.C. § 1105(d)(1).  Finally,

though confusingly worded, ERISA § 405(b)(3)(B) seems to limit a co-trustee's liability for

following directions pursuant to ERISA § 403(a), in situations where plan assets are held by

more than one trustee, to the standard which otherwise applies under § 403(a) when there is a

single trustee.[23]  ERISA § 405(b)(3)(B), 29 U.S.C. § 1105(b)(3)(B) ("No trustee shall be

---

[22] This subsection of ERISA provides that:

In the case of a pension plan which provides for individual accounts and
permits a participant or beneficiary to exercise control over the assets in his
account, if a participant or beneficiary exercises control over the assets in his
account (as determined under regulations of the Secretary)--
  (A) such participant or beneficiary shall not be deemed to be a
fiduciary by reason of such exercise, and
  (B) no person who is otherwise a fiduciary shall be liable under this
part for any loss, or by reason of any breach, which results from such
participant's or beneficiary's exercise of control.

ERISA § 404(c)(1), 29 U.S.C. § 1104(c)(1).

[23] Since ERISA § 405(b)(3)(B) simply refers back to ERISA § 403(a) it would seem
to beg the question of which directions of the named fiduciary are "proper."  *See* Patricia
Wick Hatamyar, *See No Evil? The Role of the Directed Trustee Under ERISA*, 64 Tenn. L.
Rev. 1, 21 (1996).  Yet, when viewed in relation to the surrounding ERISA provisions,
ERISA § 405(b)(3)(B) sheds some light on the fiduciary responsibility of a directed trustee.
Thus, § 405(a) sets out the general rules for co-fiduciary duty.  Sections 405(c) and 405(d)
limit co-fiduciary liability for the actions of another fiduciary.  If § 405(b) limits co-trustee
responsibility to the standard set forth in §  403(a), it stands to reason (by analogy) that the
drafters considered this a limited standard as well.  *See Herman v. NationsBank Trust Co.*,

liable under this subsection [entitled 'Assets held by two or more trustees'] for following instructions referred to in section 1103(a)(1) of this title.").  Thus, while it may be accurate to say that ERISA's general purpose is to protect plan assets, this does not mean that all ERISA actors and fiduciaries in all circumstances have a duty of ordinary care.  Section 403(a) and the various analogous provisions noted here make clear that Congress intended to limit the liability of certain fiduciaries for actions over which these fiduciaries have no discretionary authority.

To sum up, then, § 403(a), by its terms and context, plays an appropriately distinctive role in the ERISA scheme: It prescribes the duties of an ERISA fiduciary acting as a directed trustee.  Specifically, § 403(a) requires a directed trustee to comply with the directions of a named fiduciary.  And importantly, a directed trustee under § 403(a) has no duty to assess the merits of a named fiduciary's direction and to reject that direction, if, in the exercise of the directed trustee's independent judgment, the direction is imprudent.  Indeed, the directed trustee has no discretion to do so and hence incurs no liability for complying with a direction simply because it may arguably be imprudent.  To be sure, Section 403(a) makes unmistakably clear that a directed trustee must implement the named fiduciary's direction provided the directions are proper, *i.e.*, that they meet certain formal requirements and hence are identifiably genuine or valid directions from an authorized fiduciary, and provided further that they are not violative of the plan or ERISA.  Nor do either of these provisos import into § 403(a) a duty of ordinary care to second guess the financial wisdom of the named

---

126 F.3d 1354, 1361 (11th Cir. 1997) (listing the directed trustee relationship as one of the "three exceptions to exclusive trustee authority" along with the delegation to investment managers and participant control).

fiduciary's directions.  Rather, the provisos merely insure (i) that a direction is valid, as distinguished from some spurious order or suggestion from an unauthorized source and (ii) that a direction is not patently violative of ERISA or the plan, for example, by requiring the directed trustee to engage in an explicitly prohibited transaction or where the direction is the product of collusive and fraudulent acts based on non-public information.  To hold otherwise— to impose on directed trustees a duty to second guess the prudence of a named fiduciary's proper directions—would negate the purpose and function of § 403(a) and invite wasteful disputes and litigation between named fiduciaries and directed trustees over the wisdom of each direction.[24]  Given the construction of § 403(a) reached here, it follows that Fidelity, as a directed trustee, incurred no liability when it did not countermand US Airways' continuing direction to retain the Company Stock Fund as an investment option for Plan participants despite a reasonable basis for pessimism about the US Air Group's financial prospects.

   This result finds firm support in a recent Field Assistance Bulletin ("FAB") of the Department of Labor ("DOL"), interpreting the language of ERISA § 403(a), and similarly construing the duty of a directed trustee to make independent prudence determinations to be

---

[24] Indeed, imposing a duty of ordinary care on directed trustees to second guess the investment choices directed by the named fiduciary might result in subjecting a directed trustee to "Catch 22" liability.  For example, if a directed trustee judged an investment option "x" chosen and directed by a named fiduciary as substantially imprudent, the directed trustee would have a duty to refuse to offer this option, and would arguably incur liability if it failed to refuse.  Yet, if option "x" then confounded conventional wisdom and not only survived but prospered, the directed trustee might be liable to plan participants for failing to follow the named fiduciary's direction to offer option "x."

"significantly limited."[25]  *See* Department of Labor, Field Assistance Bulletin No. 2004-03 at

4-6 (Dec. 17 2004) [Hereinafter FAB].  According to the FAB's interpretation of the statute,

a directed trustee will not be liable for failing to act on public information unless there are

"clear and compelling public indicators, as evidenced by an 8-K filing with the Securities and

Exchange Commission (SEC), a bankruptcy filing or similar public indicator, that call into

serious question a company's viability as a going concern . . . ."  FAB at 1-2, 5-6.  The DOL

explicates this standard in a particularly relevant manner:

---

[25]  The DOL's interpretation of ERISA, while not binding here, is nonetheless entitled
to deference depending upon "the thoroughness evident in its consideration, the validity of its
reasoning, its consistency with earlier and later pronouncements, and all those factors which
give it power to persuade, if lacking power to control."  *Skidmore v. Swift*, 323 U.S. 134, 140
(1944).  *Skidmore* deference is especially appropriate "where the regulatory scheme is highly
detailed" and the agency "can bring the benefit of specialized experience to bear on the subtle
questions" in a particular case.  *United States v. Mead*, 533 U.S. 218, 235 (2001).
Furthermore, in interpreting statutes like ERISA, where the agency has at least partial
enforcement authority, "good administration of the Act and good judicial administration alike
require that the standards of public enforcement and those for determining private rights shall
be at variance only where justified by very good reasons."  *Skidmore*, 323 U.S. at 140.  In the
case of ERISA, the DOL's interpretation is especially worthy of deference.  ERISA, like the
customs regulations at issue in *Mead*, is a "comprehensive and reticulated statute." *Hughes
Aircraft Co. v. Jacobson*,  525 U.S. 432, 447 (1999) (quoting *Nachman Corp. v. Pension
Benefit Guaranty Corp.*, 446 U.S. 359, 361 (1980)).  Further, the Department of Labor
possesses specialized experience that informs its interpretation of the statute, and like the Fair
Labor Standards Act at issue in *Skidmore* itself, ERISA provides the government with parallel
enforcement authority under ERISA § 409.  *See* ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).
    In addition, the reasoning supporting the DOL's interpretation is sound.  It is based, in
part, on the principle that markets are "assumed to be efficient so that stock prices reflect all
publicly available information and known risks."  FAB at 5.  Stated differently, this theory
holds that stocks are priced at the level where evidence that the investment is imprudent is
balanced by evidence that it is prudent.  *See, e.g., Basic, Inc. v. Levinson*, 485 U.S. 224, 241-
47 (1988) (employing the capital market hypothesis); *see also* Jonathan R. Macey, *Efficient
Capital Markets, Corporate Disclosure and Enron*, 89 Cornell L. Rev. 394, 418 (2004).  The
DOL's interpretation is also based on the fact that the named fiduciary is already subject to
the strictures of ERISA § 404(a), and therefore, requiring the directed trustee to adhere to the
same standard would be duplicative, and could undermine otherwise clear allocation of
authority reflected in § 303(a).  FAB at 5.

[A] directed trustee's actual knowledge of media or other public reports or analyses that merely *speculate* on the continued viability of a company does not, in and of itself, constitute knowledge of clear and compelling evidence concerning the company sufficient to give rise to a directed trustee's duty to act.

FAB at 6 n.5 (emphasis added). Perhaps even more relevant is the DOL's observation that where, as here, the directed trustee possesses only publicly available information, the DOL's standard imposes liability on a directed trustee only after the named fiduciary has filed for bankruptcy, and even then only "under circumstances which make it unlikely that there would be any distribution to equity-holders with any value . . . ."[26] FAB at 6. Clearly, in the view of the DOL, a direction to retain company stock as a plan investment option is not contrary to ERISA until the shares are worthless as a matter of fact, and not as a matter of conjecture or investment judgment about the future.

The Fourth Circuit has not yet addressed this question, and while courts from other jurisdictions have done so, the results vary widely.[27] The better reasoned decisions support

---

[26] Even in this situation, the FAB concludes that:

[I]t might not be imprudent to purchase or hold stock in a distressed company in bankruptcy. There may be situations in which the plan's fiduciaries could reasonably conclude that the stock investment makes sense, even for a long-term investor, in light of the proposed restructuring of the company's debts or other factors.

FAB at 6 n. 6

[27] *Compare In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 599 (S.D.Tex. 2003) ("At least where the facts alleged . . . provide reason for the trustee to have known . . . of a breach of fiduciary duty, this Court finds that those cases which construe § 403(a)(1) to require something more than a duty to check superficial compliance . . . effectuate ERISA's underlying policies and purposes better.") *and Koch v. Dwyer*, 1999 U.S. Dist. LEXIS 11101 at *30 (S.D.N.Y. 1999) ("[If] the direction to invest in . . . common stock was imprudent or . . . the fiduciaries' direction to make that investment was based on inadequate investigation, [the directed trustee] would not be immune from liability . . . ."), *with Herman v. NationsBank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997)

the result reached here.  Particularly instructive is *Worldcom II* where a district court refused to require the directed trustee to exercise its independent judgment to countermand the investment decisions of the named fiduciary.  *Worldcom II,* 354 F. Supp. 2d at 449. *Worldcom II* involved allegations similar to those made here by plaintiff, namely that the directed trustee of the Worldcom plan "breached the duty of prudence in ERISA § 404(a) by continuing to offer Worldcom stock as an investment alternative within the Plan when the directed trustee knew or should have known that such an investment was imprudent."  *Id.* at 427.  The directed trustee in *Worldcom II*, like Fidelity in the instant case, was faced with numerous red flags that, in hindsight, seem clearly to herald the imminent collapse of Worldcom stock.  Prior to Worldcom's announcement that it would have to restate its earnings by $3.8 billion, which halted trading in the stock, (i) several news articles had questioned Worldcom's accounting and management practices, (ii) the SEC had requested documents in order to investigate certain aspects of Worldcom's accounting, (iii) the company had begun laying off its employees, and (iv) Bernard Ebbers, Worldcom's CEO, had unexpectedly resigned.  *Id.* at 436-39.  Despite these warning signs, which furnished a reasonable basis for suspecting fraud, the directed trustee did not object to the continued offering of Worldcom stock in the company's 401(k) plan.  *Id.* at 449.  On these facts, the district court nonetheless granted the directed trustee's motion for summary judgment, noting that "knowledge that a company's 'stock price and profits were declining and that the

---

("[I]nsofar as a trustee acts at the discretion of a named fiduciary in accordance with the terms of the plan and ERISA's requirements, he is not subject to the fiduciary requirement in § 1104(a) to act prudently.") *and Maniace v. Commerce Bank of Kansas City*, 40 F.3d 264, 268 (8th Cir. 1994) ("[The directed trustee] was not required to weigh the merits of an investment in [the named fiduciary] stock against all other investment options every time it was directed to purchase said stock.").

company was undergoing a restructuring' is not sufficient to find a breach of a fiduciary duty where the trustee continued to invest plan funds in the company's stock as directed." *Id.* (quoting *Lalonde v. Textron, Inc.*, 369 F.3d 1, 7 (1st Cir. 2004)). And inn reaching this result, the district court also found the DOL's FAB on the issue persuasive, noting that it was "consistent with prior statements of the law," "well reasoned," and the product of "careful analysis."[28] *Id.* at 446.

Similarly instructive is the Eight Circuit's influential decision in *FirsTier Bank v. Zeller*, 16 F.3d 907, 911-12 (8th Cir. 1994). There the Eighth Circuit accepted the fiduciary status of directed trustees,[29] but specifically declined to find a general duty of prudential inquiry, especially when the directed trustee was acting at the behest of plan participants.

---

[28] *Worldcom II* is the only decision (other than this) to consider both the soundness of the FAB on this issue and whether it merits deference in construing ERISA.

[29] Other courts have seized on this holding finding *some* standard of care to support the imposition of a *high* standard of care on directed trustees. For example, the district court opinion in *Enron*, cited by plaintiffs, inaccurately cites *FirsTier* opinion as support for the imposition of a duty of inquiry on directed trustees. *Enron*, 284 F. Supp. 2d at 596 ("The trustee is ordinarily under a duty to make a reasonable inquiry and investigation in order to determine whether the holder of the power is violating his duty.") (quoting *FirsTier*, 16 F.3d at 912 (quoting *Scott on Trusts* § 185)). In fact, this language was quoted as "some support" for the plaintiff's argument, which the court rejected. *Id.* Similarly, the district court in *Kling v. Fidelity Management*, 270 F. Supp. 2d 121, 130 (D. Mass 2003), inaccurately cited *FirsTier* for the proposition that "a directed trustee [has] a duty of prudence under ERISA § 404 to inquire into the merits of loans, even if made at the direction of another fiduciary . . . ." *Id.* at 130 (citing *FirsTier*, 16 F.3d at 911). *See also*, *In re Sprint Corp. ERISA Litig.*, No. 03-2202, 2004 U.S. Dist. LEXIS 9622, at *75 (D. Kan. 2004) (citing *FirsTier* for the proposition that "a directed trustee may not comply with directives that the trustee knows or ought to know violate the fiduciary's duties to the beneficiaries, and the trustee must still conform to the prudent person standard of care."). While the 8th Circuit did hold that directed trustees were fiduciaries, it did not equate fiduciary status with a general duty of inquiry. On the contrary, the Eighth Circuit specifically declined to find a duty of inquiry. *See FirsTier*, 16 F.3d at 912 ("[W]e find nothing in the statute suggesting that, to be prudent, a trustee must ask the recipients of participant loans that are exempt under § 1108(b)(1) the purpose for which they are lawfully borrowing their share of the plan's assets.").

*FirsTier*, 16 F.3d at 911-12.  Other courts have arrived at similar conclusions by imposing a duty of prudence on directed trustees only to the extent the directed trustee had discretion over the act alleged to have caused the loss.[30]

The Eight Circuit's decision in *Maniace v. Commerce Bank of Kansas City*, 40 F.3d 264, 267 (8th Cir. 1994), follows *FirsTier's* guidance in upholding the grant of summary judgment for the directed trustee of an employee stock ownership plan ("ESOP") despite its knowledge of mismanagement of the company that eventually resulted in a bankruptcy filing that wiped out the value of the shares.  *Maniace*, 40 F.3d at 266.  Likewise, in *Lalonde v. Textron, Inc.*, 369 F.3d 1 (1st Cir. 2004), plaintiff's breach of fiduciary duty claims were based on the directed trustees alleged knowledge of a host of warning signs: (i) a sharp decline in Textron's earnings, (ii) a restructuring that was expected to culminate in the termination of more than 10% of the company's workforce, (iii) the artificial inflation of its stock price, and (iv) significant under-performance of the company's shares.  *Id.* at 3.  Despite this litany of red flags, the First Circuit upheld the district court's grant of a motion to dismiss because the directed trustee was "not alleged to have knowledge of any malfeasance within Textron," but "only to have learned (as the events were unfolding) that Textron's stock price and profits were declining and that the company was undergoing a restructuring."

---

[30]  *See Herman v. NationsBank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997) ("If a plan falls under one of the three exceptions to exclusive trustee authority [including the directed trustee relationship], then the responsibilities of the trustee are correspondingly lessened.");  *Maniace v. Commerce Bank of Kansas City*, 40 F.3d 264, 267 (8th Cir. 1994) ("[A] trustee for a plan is not necessarily a fiduciary for the entire plan.  'Fiduciary status under § 1002(21)(A) is not an all or nothing concept.'") (quoting *Kerns v. Benefit Trust Life Ins. Co.*, 992 F.2d 214 (8th Cir. 1993)); *In re McKesson HBOC, Inc. ERISA Litig.*, 2002 U.S. Dist. LEXIS 19473 at *35-36 (N.D.Cal. 2002) ("Thus, [the directed trustee] was required to follow the directions from other plan fiduciaries and it cannot be held liable for any loss that results from the performance of its duty to follow those directions.").

*Id.* at 7.  Accordingly, courts in well-reasoned decisions have declined to hold directed trustees responsible for the named fiduciary's directions to include company stock in the retirement plan even when the company's financial fortunes were in decline.[31]

Cases cited by plaintiff that hold directed trustees to a higher standard of fiduciary duty are not persuasive.  The opinion in *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F. Supp. 2d 511 (S.D.Tex. 2003), is distinguishable on the facts as it involved significant allegations and signs of fraud or illegal activity, none of which is alleged here.  *Id.* at 534-35 & n.11 (describing the suspicious circumstances surrounding the timing of the named fiduciary's direction to "lockdown" plan assets).  Similarly, *Koch v. Dwyer*, No. 98 Civ. 5519, 1999 U.S. Dist. LEXIS 11101, at *31 (S.D.N.Y. 1999), involved allegations, not present here, that the directed trustee was aware of fraud on the part of the named fiduciary. *Id.* Further, *Enron*, *Koch*, as well as *In re Sprint ERISA Litig.*, No. 03-2202, 2004 U.S. Dist. LEXIS 9622, at *76 (D. Kan. 2004) and *Kling v. Fidelity Mgmt. Trust Co.*, 270 F. Supp. 2d 121, 131-32 (D. Mass. 2003), also relied on by plaintiff, are also unpersuasive because they fail to provide any convincing rationale for requiring directed trustees under § 403(a) to exercise their independent judgment concerning the wisdom of a named fiduciary's investment decisions.[32]  By doing so they ignore the plain language of § 403(a) which makes

---

[31]  The case cited by plaintiff in which a district court rejects the so-called "brink of collapse" standard is easily distinguished, as it does so in evaluating the prudence of the named fiduciary, not that of the directed trustee.  *See, e.g., In re Syncor ERISA Litigation*, 351F. Supp. 2d 970, 980-82 (C.D. Cal. 2004).

[32] *In re Sprint,* 2004 U.S. Dist. LEXIS, at *76 , places primary reliance on *FirsTier*, which is misplaced, as previously noted.  *See* supra note 29 and accompanying text.  *Kling*, 270 F. Supp. 2d at 132, relies primarily on *Koch*, which, as noted, is a fraud case and therefore inapposite.

a directed trustee "subject to the directions" of the named fiduciary.  The district court's opinion in *Enron* is also unpersuasive because it places excessive reliance on trust principles to the detriment of the plain language of § 403(a).  *Enron*, 284 F. Supp. 2d at 588.  While trust principles are generally an appropriate aid to the interpretation of ERISA, they should not be used to trump the plain meaning of the statute.  *See Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996) ("In some instances, trust law will offer only a starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departing from common-law trust requirements.").

Section 403(a)'s text and context, the DOL's FAB, and the better reasoned decisions of other courts all point persuasively to the conclusion that the publicly available information available to Fidelity prior to the appointment of the independent fiduciary wass simply not sufficient to have triggered a duty to object to the direction to continue to include the Company Stock Fund as an investment option in the Plan.  While the failure of the merger with United Airlines was a significant setback for US Airways, it did not signal its imminent collapse.  Had it done so, US Air Group's shares would not have closed at $17.26 per share on July 27, 2001 after the announcement of the merger's failure.  Nor were management's public acknowledgments of the possibility of bankruptcy sufficient to trigger Fidelity's duty as a directed trustee to question the prudence of the named fiduciary's directions.  These statements, made both before the fate of the merger was known and after the terrorist attacks of September 11, 2001, do not constitute a formal bankruptcy filing, which the FAB sensibly recognizes as the proper trigger for a duty of inquiry by the directed trustee.  FAB at 6 n.6.  Similarly, the hiring of bankruptcy counsel is not sufficient to trigger the directed trustee's duty to countermand the named fiduciary's direction; bankruptcy counsel are often retained to

-32-

advise companies on restructuring in general, and in some instances, to be sure, to prepare a draft bankruptcy filing for possible future use. Even assuming Fidelity had known that US Airways had retained bankruptcy counsel, Fidelity would not be required to question the continuing direction to include the Company Stock Fund as a Plan investment choice.

Plaintiff's argument that Fidelity breached its fiduciary duty by accumulating too much stock in the Common Stock Fund is likewise unavailing. By June of 2002, the Company Stock Fund had accumulated over 30% of the outstanding shares of Group stock, which plaintiff alleges Fidelity could not liquidate before the shares lost their value. These assertions are simply restatements of plaintiff's principal argument that Fidelity should have questioned the prudence of retaining the Company Stock Fund as a Plan investment option. Fidelity was bound by the § 403(a) and the terms of the Trust Agreement to execute purchases of US Air Group stock at the direction of participants and to maintain the agreed upon stock to cash ratio. See Trust Agreement §§ 1.5(b), 8.1. The accumulation of a large percentage of US Air Group stock presents a problem only if there is little or no demand for the stock at any price, which is simply another way of describing a bad investment. For the reasons already noted, Fidelity, as a directed trustee, had no duty to predict the financial fortunes of US Air Group, and therefore cannot be tasked with predicting liquidity problems that might arise when the demand for the US Air Group's shares evaporates.

Finally, plaintiff claims that the trading activity of Fidelity's actively managed funds provides evidence that Fidelity was aware that investments in US Airways stock were imprudent.[33] At most, this shows only that Fidelity's investment judgment was that there

---

[33] As evidence, plaintiff points to trading activity that occurred in 1998 and 1999, before the class period commenced. Significantly, in the period between June 30, 2001, the

were better investments than US Air Group stock; it says nothing about whether Fidelity has a duty as a directed trustee under the Plan to exercise its independent judgment to countermand US Airways' direction.  Put simply, Fidelity's duty as a directed trustee is very different from its duty as an active fund manager.  The US Airways 401(k) Plan left investment decisions in the hands of US Airways and the Plan participants themselves.  Plan § 7.1 ("The Company shall determine the number and type of Investment Funds and select the investments for such investment funds."); Plan § 6.2 ("A Participant may elect at any time to transfer investments from any Investment Fund to any other Investment Fund in the manner and form prescribed by the Company.").   As a directed trustee, Fidelity's primary duty was to follow the directions of the named fiduciary and of the plan participants, except in extraordinary circumstances not alleged in the complaint.  As an active fund manager, Fidelity (or any mutual fund manager) will presumably decrease its holdings anytime it thinks the odds the stock price will decline are greater than the chances the stock price will increase.  To conflate these two roles is to misunderstand Fidelity's role as a directed trustee and to require Fidelity to assume responsibilities it was not paid for and had not accepted.[34]

---

last report of Fidelity's holdings before the class period commenced, and March 31, 2002, the final reporting period before the appointment of an independent fiduciary, Fidelity's holdings in actively managed funds were reduced by 2%, hardly evidence that Fidelity knew that investments in US Airways stock were imprudent.  It is fair to note, however, that Fidelity disposed of most of the US Air Group shares held in its actively managed funds in the three months between April 1, 2002 and June 30, 2002, the period during which US Airways retained an independent fiduciary to manage plan assets.

[34] It is worth repeating here that the Trust Agreement itself provides that "[t]he Trustee shall have no responsibility for the determination of Investment Funds or the selection of investment vehicles for such Investment Funds and shall not render investment advise [sic] to any person in connection thereto." Trust Agreement § 1.5(a).

## IV.

The First Amended Complaint also alleges that Fidelity is liable under ERISA

§ 405(a), 29 U.S.C. § 1105(a), for the breach of a co-fiduciary, namely US Airways.[35]  This

argument misses the mark for essentially the same reasons that plaintiff's principal argument

misses the mark:  like the principal argument, this argument reads § 403(a) out of ERISA by

imposing on a directed trustee all the duties of the named fiduciary.  It is true that because

directed trustees are fiduciaries under ERISA, if limited fiduciaries, with respect to the plan,

they are subject to co-fiduciary liability.  Significantly, however co-fiduciary liability, like the

general fiduciary liability from which it derives, is not an all or nothing proposition.  *See*

*Maniace*, 40 F.3d at 267.  A limitation on a directed trustee's duties under ERISA § 403(a)

would have little effect if the directed trustee's co-trustee liability was not similarly limited.[36]

---

[35]  ERISA § 405(a) states:
In addition to any liability which he may have under any other provisions of
this part, a fiduciary with respect to a plan shall be liable for a breach of
fiduciary responsibility of another fiduciary with respect to the same plan in
the following circumstances:

    (1) if he participates knowingly in, or knowingly undertakes to
conceal, an act or omission of such other fiduciary, knowing such act or
omission is a breach;

    (2) if, by his failure to comply with section 1104(a)(1) of this title in
the administration of his specific responsibilities which give rise to his status
as a fiduciary, he has enabled such other fiduciary to commit a breach; or

    (3) if he has knowledge of a breach by such other fiduciary, unless he
makes reasonable efforts under the circumstances to remedy the breach.

ERISA § 405(a), 29 U.S.C. § 1105(a).

[36]  Allowing an end run around ERISA § 403(a) by use of § 405(a) would therefore
violate the rule of statutory construction requiring that effect be given to all provisions of a
statute.  *See U.S. v. Williams*, 364 F.3d 556, 559 (4th Cir. 2004) ("[A] court is obliged to

Therefore, where, as here, a directed trustee is not alleged to have violated his exclusive duties, but to have failed to object to the named fiduciary directions, a directed trustee's primary liability as a fiduciary, and its secondary liability as a co-fiduciary are essentially co-extensive.  As the *Enron* court recognized:

> [I]f the directed trustee follows 'proper' directions of the named fiduciary with respect to that part of the plan management or control granted to the named fiduciary, and if those directions are 'in accordance with the terms of the plan' and 'not contrary to' ERISA under § 403(a)(1), the directed trustee is not liable for a co-fiduciary's (the named fiduciary's) breaches.

*Enron*, 284 F. Supp. 2d at 584-85.

Because the complaint does not allege facts sufficient to find that Fidelity violated its duties under § 403(a), it failed to allege a violation of either § 405(a)(1) or § 405(a)(3).  Nor, for the same reason, does the complaint allege facts sufficient to state a claim under § 405(a)(2).  For these reasons, plaintiff's claim alleging breach of co-fiduciary duty must therefore be dismissed, as well.

**V.**

Finally, because the complaint has failed to state a claim for breach of fiduciary duties against Fidelity, it is not necessary to decide Fidelity's alternative argument regarding the duration of the class period.  For all the reasons discussed above, Fidelity's motion to dismiss must be granted.  An appropriate order will issue.

/s/
_____
Alexandria, VA                           T. S. Ellis, III
September 27, 2005                        United States District Judge

_____

'give effect, if possible, to every word Congress used.'") (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).